IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TED CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:19-cv-209-SMD |
| | ) | |
| CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

## I.     INTRODUCTION

Plaintiff, Ted Clark ("Clark"), served in the Montgomery Fire Department ("MFD") for over thirty years.  Clark Decl. (Doc. 32-1) ¶ 2.  During his entire civilian MFD career, he concurrently served as a drilling soldier in the Alabama Army National Guard ("ALARNG").  *Id.*  Clark took extended leave from the MFD in July 2018 to care for his sick mother and never returned to work.  *Id.* at ¶ 19.  He alleges that the MFD constructively discharged him by forcing him to retire in February 2019.  *Id.* at 2.  He brings discrimination and retaliation claims against the City of Montgomery (the "City") under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4355, and procedural due process claims under the United States and Alabama constitutions.  Amd. Compl. (Doc. 28) Counts I & II.  Clark seeks compensatory damages and equitable relief including back pay, front pay, and attorney's fees.  *Id.* at 10.

Clark has failed to support his claims with sufficient evidence to allow a jury to return a verdict in his favor. Accordingly, the City's motion for summary judgment is GRANTED and Clark's claims are DISMISSED in their entirety WITH PREJUDICE.

## II.   CLARK'S CLAIMS

Count I is a claim for USERRA discrimination and retaliation under 38 U.S.C. § 4311. Clark alleges that the City discriminated and retaliated against him for taking military leave by (1) refusing to consider him for promotion, (2) failing to provide him with adequate notice and information regarding his leave and extended leave, (3) refusing to allow him to return to work, (4) wrongfully threatening him with termination and loss of accrued benefits, and (5) constructively discharging him. Amd. Compl. (Doc. 28) ¶ 34.

Count II asserts procedural due process claims under the United States and Alabama constitutions. Amd. Compl. (Doc. 28) ¶ 39. Clark brings his federal due process claim pursuant to 42 U.S.C. § 1983, and apparently brings his State claim directly under the Alabama Constitution (1901) Art. I, §§ 13, 35. *Id.* ¶¶ 2, 39. Clark alleges that the City deprived him "of employment, income, benefits and other property without providing adequate notice or a pre-termination hearing." *Id.* at ¶ 43.

Clark seeks unspecified compensatory damages and equitable relief including back pay, front pay, and attorney's fees. *Id.* at 10.

## III.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the non-moving party bears the burden of proof at trial, summary judgment

is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of the plaintiff's claim dictate which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is not material if a dispute over that fact will not affect the outcome of the case under the governing law. *Id.* "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 331 (White, J., concurring).

The court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234,1243 (11th Cir. 2001). However, a mere scintilla of evidence in support of a position is insufficient; the nonmovant must produce sufficient evidence to enable a jury to rule in his favor. *Id.* The Eleventh Circuit explains that "[s]imply put, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (internal quotes and citations omitted).

## IV. OPERATIVE FACTS[1]

### A. Clark's MFD Career

---

[1] These facts view the summary judgment record in the light most favorable to Clark and resolve all factual disputes in his favor. The City disputes several of these facts, but they are the operative facts for summary judgment.

Clark joined the MFD in August 1988.  Clark Decl. (Doc. 32-1) ¶ 2.  He served concurrently as a drilling soldier in the ALARNG throughout his MFD career.  *Id.*  City employees are granted over four weeks (up to 168 hours) of paid military leave per calendar year.  Personnel Board Rules and Regs. Rule VIII, § 7, Military Leave (Doc. 32-2) at 55.  Throughout his MFD career, Clark regularly took military leave to attend weekend drills and annual training.  Clark Depo. (Doc. 29) Def. Ex. 4 at 84.  From June 2004 through September 2005, Clark deployed to Afghanistan.  *Id.*; Clark Depo. (Doc. 29) Def. Ex. 4 at 74-75.  Upon his return, MFD promoted him to Lieutenant.  *Id.*  The MFD subsequently promoted him to Captain in 2008 and District Chief in 2012.  *Id.* at 78-80.  Clark went on military orders from July through September 2013, and MFD promoted him to Assistant Fire Chief in 2015.  *Id.* at 79-80.  Montgomery Fire Chief Miford Jordan recommended Clark for all of these promotions.  Jordan Affidavit (Doc. 29-2) ¶ 3.  Jordan had become Fire Chief in 2006 and had served in the ALARNG for a number of years during his MFD career.  *Id.*  He believed that "those who serve in the military bring unique qualities to fire service."  *Id.*

In 2016, Clark was promoted to Sergeant Major (SGM) in the ALARNG.  Clark Decl. (Doc. 32-1) ¶ 4.  He was proud of this achievement and informed Chief Jordan.  Clark Depo. (Doc. 29) Def. Ex. 4 at 92-93.  Chief Jordan told Clark that the time commitment required to be a Sergeant Major could interfere with his MFD job and that he could not promote him any higher than his current position as Assistant Fire Chief.  Clark Decl. (Doc. 32-1) ¶¶ 4-6; Clark Depo. (Doc. 29) Def. Ex. 4 at 92-93.  He also told him that if he ever

did promote him to Chief of Operations or Chief of Staff, attending military drills or possibly deploying would interfere with the job. Clark Decl. (Doc. 32-1) ¶ 6.

Clark reported this conversation with Chief Jordan to a full-time officer in his military command, MAJ Broderick Pickett, and they raised the issue with their battalion commander, Colonel (COL) Mark Presley. Pickett Decl. (Doc. 32-5) ¶¶ 3-8. Clark informed COL Presley that the MFD was frustrating his attendance at ALARNG drills and that Fire Chief Jordan had accused him of making verbal threats to other firefighters. Presley Decl. (Doc. 32-6) ¶¶ 3, 5. COL Presley felt that "due to this information and accusation made against Mr. Clark, I was required to call Montgomery Fire Chief Miford Jordan." Presley Decl. (Doc. 32-6) ¶ 6. COL Presley "called Chief Jordan regarding the allegations made against Mr. Clark [and] Fire Chief Jordan claimed that Mr. Clark had lost his temper and made verbal threats against other firefighters." *Id.* ¶ 7. He "informed Chief Jordan that if any investigations had been filed or the police had been notified that [he] would need to know that in reference to SGM Clark's security clearance." *Id.* ¶ 8. He "brought up the issues concerning Mr. Clark attending drills with the Alabama National Guard" and "Chief Jordan offered no response and immediately dropped any further discussion concerning Mr. Clark." *Id.* After this conversation with COL Presley, Chief Jordan often made passing remarks to Clark referencing his military status such as "you're not drilling today?"[2] Clark Decl. ¶ 10.

---

[2] In his deposition testimony, Clark attributes these remarks to Chief of Operations Bolling, not Chief Jordan. Clark Depo. (Doc. 29-4) Def. Ex. 4 at 9. Clark does not explain this discrepancy, but for purposes of summary judgment, the Court accepts the version in Clark's declaration as true.

Sometime in 2018, Clark informed another officer in his military command, Lieutenant Colonel (LTC) Ernest Norman, that "his employer was forcing him to make a choice between his job as a firefighter and his position with the Alabama National Guard." Norman Decl. (Doc. 32-8) ¶ 7. "After listening to Mr. Clark's many frustrations with his employer, [LTC Norman] called Ron Sams, the Montgomery Director of Public Safety, and told Mr. Sams that [he] was very concerned with the way Montgomery was adversely treating Mr. Clark because of his participation in the Alabama National Guard." *Id.* ¶ 8. LTC Norman "told Mr. Sams that this was a very serious matter," and Sams said "he would look into it and call [him] back," but he never did. *Id.* ¶¶ 8-9.

On February 13, 2018, MFD Chief of Operations Kenneth Bolling wrote a memorandum to Clark documenting deficiencies in his record-keeping for annual medical evaluations and pre-employment physicals in his division. Bolling Memo. (Doc. 29-1) Def. Ex. 1 at 24. On July 6, 2018, MFD Chief of Staff J.L. Petrey wrote a memorandum to file concerning Clark documenting a "pattern of repeated and escalating inadequate performance[.]" Memorandum (Doc. 29-1) Def. Ex. 1 at 18; (Doc. 32-7) at 1. The memo states that it "serve[s] as written notification concerning his unacceptable performance according to department expectations" and that "disciplinary action will be recommended if his performance does not improve." *Id.* The memo documents eight instances of substandard performance from 2017 through 2018. *Id.* at 19-20; 2-4. It does not mention excessive absences from work, or anything related to Clark's ALARNG duties. *Id.* After receiving this memo, Clark met with an ALARNG JAG officer and they worked on a draft memo to send back to Petrey and Chief of Operations E.D. Gauntt (Gauntt). Clark Decl.

(Doc. 32-1) ¶¶ 17-18; Clark's Draft Memo (Doc 32-9).  Clark's draft memorandum is a point-by-point rebuttal of Petrey's memo.  *Id.*  It does not mention USERRA or any alleged interference by the MFD in Clark's ability to perform his ALARNG duties.  *Id.*  Clark never sent the memorandum to Petrey and Gauntt.  Clark Decl. (Doc. 32-1) ¶ 17.

### B.   <u>Extended Leave & Retirement</u>

On July 26, 2018, Clark applied for leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, so that he could care for his mother who had developed dementia.  FMLA Leave Application (Doc. 29-1) Def. Ex. 1 at 1-9; Clark Decl. ¶ 19.  MFD approved the application and granted Clark twelve weeks of FMLA leave from July 30, 2018, through October 22, 2018.  FMLA Leave Application (Doc. 29-1) Def. Ex. 1 at 9. Clark continued to drill and perform annual training in the ALARNG while on FLMA leave from the MFD.  Clark Depo. (Doc. 29) Def. Ex. 4 at 52-53.  He also periodically checked in on the dry-cleaning business he owned.  *Id.* at 53-54.

Clark did not communicate with the MFD during his three months of FMLA leave, Clark Depo. (Doc. 29) Def. Ex. 4 at 50, and he did not return to work on October 23 when his leave expired.  Chief of Staff Petrey sent Clark a letter informing him that he had exhausted his FMLA leave but that he currently remained on Family Sick Leave.  Petrey Letter dated Oct. 23, 2018 (Doc. 32-10); (Doc. 29-1) Def. Ex. 1 at 16.  Petrey gave Clark three options: (1) request extended leave due to his inability to return to work because of his family member's medical condition; (2) retire, as he was retirement eligible; or (3) return to work upon receipt of the letter.  *Id.*  Petrey's letter informed Clark that "[i]f you elect to request an extended leave, it **may** be granted to you if Montgomery Fire/Rescue's

workload permits and it is for your family member's prolonged illness.  If granted, you will need to submit an updated physician's certification statement . . . to my office by November 9, 2018.  You will then be notified if your extended leave request has been approved."  *Id.*  The letter further informed Clark that "[i]f I do not hear from you by November 9, 2018, I will assume that you have abandoned your position and your employment with the City of Montgomery will be terminated."  *Id.*

Clark contacted Petrey by telephone on November 8 and 9 and told him that he was trying to get back to work as quickly as possible and was waiting for the necessary paperwork from his mother's doctor to request extended leave.  Clark Decl. (Doc. 32-1) ¶ 23; Clark Depo. (Doc. 29) Def. Ex. 4 at 56-57.  Clark was dissatisfied with Petrey's reaction, and he went to see Director of Public Safety Sams and "explained my situation to him about the way I was being treated for being a member of the Alabama National Guard, and the fact that I was still waiting on paperwork from my mother's doctor so that I could go on Extended Leave[.]"  Clark Decl. (Doc. 32-1) ¶ 24.

On November 16, 2018, the day after he visited Sams, Clark received a second letter from Petrey informing him that "you were advised of the options available to you due to the exhaustion of your 12 weeks of leave under the Family Medical and Leave Act[.]"  Petrey Letter dated Nov. 16, 2018 (Doc. 32-12).  The letter stated that "[a]s of today, November 16, 2018, we have not received any response from you.  Therefore, we must assume that you have abandoned your position and your employment with the City of Montgomery will be terminated effective immediately."  *Id.*  Upon receipt of this letter, Clark called Sams who told him he would look into the situation and call Clark back.  Clark

Decl. (Doc. 32-1) ¶ 26.  Sams called Clark back and told him the City was going to let him use his accumulated annual leave, sick leave, and comp time, but Clark never received any "documents, rules, procedures, or forms" regarding this.[3]  *Id.*

On November 20, 2018, Clark sent a memorandum to Petrey stating "I am requesting extension of FMLA for the care of my mother."  Clark Memo dated Nov. 20, 2018 (Doc. 32-13); (Doc. 29-1) Def. Ex. 1 at 14.  Clark's memo stated that "I have not abandoned my position, nor do I plan on retiring" and "am requesting to use any leave that I accumulated (sick leave, annual leave, personal leave, comp time, etc.) so I will not lose any time.  I am requesting to go on leave without pay if all of my time is exhausted, or if this request is denied."  *Id.*  Clark attached a one-paragraph letter from his mother's doctor, Dr. Divya Chandramohan, that stated "Ms. Clark, mother of Ted Clark . . . requires assistance at home and this is to request extension of the FMLA until 10/2019 so Mr. Clark can take care of his mother."  *Id.* at 2; 15.

Petrey replied to Clark the same day he received Clark's memo.  Petrey Letter dated Nov. 20, 2018 (Doc. 29-1) Def. Ex. 1 at 13.  In his letter, Petrey explained that MFD could not grant Clark extended leave through October 2019 as requested because "[i]t would not be fair to the other Montgomery Fire/Rescue personnel who are covering your job duties during your absence to ask them to continue in that fashion for almost another year."  *Id.*  Petrey granted Clark extended leave through December 31, 2018, giving him a total of five

---

[3] In his more contemporaneous record of this conversation, Clark's counsel states: "Mr. Clark promptly contacted Mr. Sims [sic] and questioned his termination.  Mr. Sims simply advised Mr. Clark that he would be receiving another letter."  Letter dated November 27, 2018, from K. David Sawyer (Doc. 92-1) Def. Ex. 1 at 11.  Counsel has not explained this discrepancy, but for purposes of summary judgment, the Court accepts the version in Clark's declaration as true.

months and thirteen days off duty to care for his mother. *Id.* Petrey advised Clark that **"[i]f you have not returned to work by January 2, 2019, we must assume that you have separated employment from Montgomery Fire/Rescue."** *Id.* (emphasis added).

Clark then retained the law firm that represents him in this action. Despite Petrey's November 20 letter granting Clark leave through December 31, on November 27, 2018, his counsel sent a letter to the Mayor and Chief Jordan referencing Petrey's November 16 letter and stating that the "City's dismissal of Mr. Clark" violated his 14th Amendment due process rights, violated the FMLA and constituted FMLA retaliation, was due to racial discrimination, and violated USERRA. Letter dated November 27, 2018, from K. David Sawyer (Doc. 32-14); (Doc. 92-1) Def. Ex. 1 at 11-12. In response, the City's counsel sent a short letter dated November 29, 2018, enclosing a copy of Petrey's November 20 letter and explaining that Clark's leave of absence had been extended through December 31, 2018. Letter dated November 29, 2018, from Stacy Lott Reed (Doc. 32-15).

Clark's extended leave expired on December 31, 2018, and he failed to return to work on Wednesday January 2, 2019, as ordered by Petrey in his November 20, 2018, letter. Jordan Affidavit (Doc. 29-2) ¶ 7. Clark also failed to report to work or contact anyone at MFD on Thursday January 3 and Friday January 4. Chief Jordan considered Clark's refusal to obey Petrey's written order insubordination and a fireable offense. *Id.* On Friday January 4, 2019, City counsel Stacey Lott Reed (Reed) sent an email to Clark's counsel, K. David Sawyer (Sawyer), stating that "Clark did not report for duty on January 2 of this year, and I would like to talk to you to discuss his intentions before the City takes

its next step."  Reed email dated Jan 4, 2019 (Doc. 29-3) Def. Ex. 3 at 7.  She invited Reed to call her by Monday January 5.[4]  *Id.*

On January 7, 2019, Sawyer sent Reed an email stating that Clark still needed to care for his mother and requesting additional leave.  Sawyer email date January 7, 2019 (Doc. 29-3) Def. Ex. 3 at 6.  The next morning, Reed sent Sawyer an email summarizing Clark's leave status from July 30, 2018 through December 31, 2018.  Reed email dated January 8, 2019 at 8:26 a.m. (Doc. 29-3) Def. Ex. 3 at 4-5.  Reed explained that "[w]hen your client made his request [for extended leave] on November 20, MFD agreed to extend his leave through the holidays so he could make alternate arrangements for his mother or pursue retirement.  No additional extensions can be granted at this juncture."  *Id.*  She gave Clark the opportunity to apply for retirement so that he could receive pay for any accumulated leave but cautioned that "[i]f he is not prepared to apply for retirement, MFD will have no option but to pursue termination."  *Id.*  Reed explained that "[o]nce that process begins, even if he submits his retirement papers, he will not be entitled to any leave payout."  *Id.*

Sawyer replied to Reed requesting "what forms must be completed and returned by Mr. Clark to request the necessary leave to care for his mother, until other options are available permitting Mr. Clark to return to work."  Sawyer email dated January 8, 2019 at 1:09 p.m. (Doc. 29-3) Def. Ex. 3 at 3-4.  Reed emailed back that "[t]here is no policy

---

[4] January 5, 2019 was in fact a Saturday and Monday was January 7.

permitting [further] extended leave and no forms to complete." Reed email dated January 8, 2019 at 2:07 p.m. (Doc. 29-3) Def. Ex. 3 at 3. She advised that "[a]t this juncture, Mr. Clark's options are to apply for retirement or face disciplinary action. To that end, if he has not made application with the City of Montgomery Retirement system by close of business tomorrow, the City will begin the process of initiating disciplinary action for his failure to return to work on Jan 2." Reed email dated January 8, 2019 at 2:07 p.m. (Doc. 29-3) Def. Ex. 3 at 2-3.

Reed and Sawyer apparently had a conversation on the afternoon of January 8, and on the morning of Wednesday January 9, Reed sent him an email stating "I'm writing to follow up on our conversation of yesterday afternoon and provide answers to the three questions you posed: (1) Can Mr. Clark have until Friday to make a decision? (2) Does he still have the option to return to work? [and] (3) If he elects to retire, will he do so in good standing?" Reed email dated January 9, 2019 at 9:12 a.m. (Doc. 29-3) Def. Ex. 3 at 1-2.

In response to Sawyer's questions, Reed stated that "I discussed the above with the fire department, and they advise that if Mr. Clark returned to work, he would still be facing disciplinary action for failing to return to work on January 2. So, returning to work is no longer an option." *Id.* at 2. She explained that "they are willing to give him until Friday to make a decision about how he wishes to proceed. If he elects to retire, he may submit his resignation by close of business Friday effective 14 days from the date of submission and remain on leave for that 14 day period." *Id.* She cautioned that "[i]f they have not received his resignation by close of business Friday, they will have no choice but to proceed with the above-referenced disciplinary action." *Id.* Sawyer wrote back, "[h]is

12

resignation/retirement will be in good standing?"  Sawyer email dated January 9, 2019 at 9:20 a.m. (Doc. 29-3) Def. Ex. 3 at 1.  Reed replied "Yes."  Reed email dated January 9, 2019 at 9:24 a.m. (Doc. 29-3) Def. Ex. 3 at 1.  Clark elected to retire and submitted his retirement papers.  Clark Decl. (Doc. 32-1) ¶ 34.

The City and County of Montgomery Personnel Board Rules and Regulations provide that "[a]ny permanent employee may be dismissed by an appointing authority for cause."  Rule X, § 4 (Doc. 32-2) at 61.  Rule IX, § 2, entitled Pre-Determination Hearing, provides that "a permanent employee is entitled to a hearing before the appointing authority . . . prior to his . . . dismissal . . . as to any charges which might cause the employee to be dismissed[.]"  *Id.* at 58.  This Rule continues that "[n]o merit system employee can be . . . dismissed . . . 'for cause' by any appointing authority unless and until such employee has been given written notice, setting forth with particularity the charges against him/her and the opportunity to be heard prior to . . . dismissal[.]"  *Id.*  These Rules are published on the City's website and Reed sent Sawyer an email containing a link to the Rules on January 7, 2019.  Reed email dated January 7, 2019 (Doc. 29-3) Def. Ex. 3 at 6.

## V.   **ANALYSIS**

### A.   **USERRA Discrimination**

The Army National Guard is an essential element of our Nation's military forces.  *See Perpich v. Dep't of Defense*, 496 U.S. 334, 346 (1990).  USERRA encourages service in the National Guard and other reserve components of the Armed Forces by (1) eliminating or minimizing the disadvantages to civilian careers that can result from such service, (2) minimizing the disruption to the lives of reserve component soldiers and their

employers by providing for prompt reemployment upon completion of military service, and (3) prohibiting discrimination on the basis of military service. 38 U.S.C. § 4301. The statute provides reemployment rights for any person whose absence from work was caused by military service. 38 U.S.C. § 4312. Clark has proffered no evidence that in his thirty-year civilian firefighting career MFD ever denied him military leave to perform ALARNG duty or denied him reemployment after such duty. Rather, he makes his USERRA claim pursuant to § 4311, which prohibits discrimination and retaliation due to military service. Amd. Compl. (Doc. 28) Count I, ¶¶ 31-36.

Section 4311(a) provides that a person who is a member of a reserve component shall not be denied "retention in employment, promotion, or any benefit of employment" on the basis of their military membership. 38 U.S.C. § 4311(a). An employer violates this section if its employee's military membership was a "motivating factor" in its adverse action unless it "can prove that the action would have been taken in the absence of such membership." 38 U.S.C. § 4311(c). The Eleventh Circuit explains that a "motivating factor does not mean that it had to be the sole cause of the employment action." *Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1238 (11th Cir. 2005). If an employer "relied on, took into account, considered, or conditioned its decision" in any way on its employee's military status, then it is a motivating factor. *Id.* (internal quotes and citation omitted).

The employee has the initial burden of establishing discriminatory motive by showing by a preponderance of the evidence that their military status was a motivating factor in their employer's decision. *Id.* The "burden [then] shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the

14

employer to take the same adverse action." *Id.* at 1238-39 (internal quotes and citation omitted).   The Eleventh Circuit notes that because discrimination is seldom open or notorious, circumstantial evidence plays a critical role in USERRA discrimination cases. *Id.* The trial court can infer discriminatory motive from a variety of factors such as: (1) the proximity between the employee's military activity and the adverse employment action; (2) inconsistencies between the employer's proffered reason and its other actions; (3) an employer's expressed hostility towards service members; and (4) disparate treatment of service members compared to other employees with similar work records. *Id.*

Here, Clark argues in an entirely conclusory fashion that "based upon all of the facts presented, Clark has created a material dispute of fact as to whether his military service was a motivating factor in the City's harassment and refusal to promote Clark."  Pl's Opp. (Doc. 32) at 19.   Clark fails to meaningfully develop this argument and does not identify what evidence in the summary judgment record he thinks supports his USERRA discrimination claim.  Of course, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment" and "the onus is upon the parties to formulate arguments[.]" *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).   The Eleventh Circuit further instructs that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.*

The undisputed facts here show that MFD promoted Clark to Lieutenant in 2005, Captain in 2008, District Chief in 2012, and Assistant Chief in 2015.  Clark Depo. (Doc. 29) Def. Ex. 4 at 74-75.  Clark was serving in the ALARNG at the time of each of these

promotions, and Chief Jordan recommended him for every promotion.  Jordan Affidavit (Doc. 29-2) ¶ 3.  Therefore, Clark's failure to promote claim can only concern his non-selection for MFD's Chief of Operations position.

The Chief of Operations is an appointed position assigned by the Fire Chief that serves at the Chief's discretion.  Jordan Affidavit (Doc. 29-2) ¶ 4.  The Chief of Operations maintains the rank of Assistant Chief but receives incentive pay when assigned to the position.  *Id.*  Chief Jordan appointed Kenneth Bolling as Chief of Operations in February 2017, and when Bolling retired, Chief Jordan appointed Assistant Chief E. D. Gauntt to the position in July 2018.  Jordan Affidavit (Doc. 29-2) ¶¶ 5, 6.  Appointment to the Chief of Operations position qualifies as a promotion or benefit of employment protected by § 4311(a) of USERRA.  *See* 38 U.S.C. § 4303(2) (defining "benefit of employment" as "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest" that accrues by reason of employment).

Clark's non-selection claim here fails at the outset because the undisputed facts show that he never applied for or expressed any interest in the Chief of Operations position.  Jordan Affidavit (Doc. 29-2) at ¶ 5; Clark Depo. (Doc. 29) Def. Ex. 4 at 81-82.  Although USERRA offers broad protections, it cannot be stretched so far as to impose liability on an employer for failing to select someone for a job they never applied for.

In addition, even if he had applied for the job, Clark's evidence fails to overcome the City's affirmative defense.  Clark alleges that sometime in 2016 Chief Jordan told him that he could not promote him any higher than Assistant Chief because the time commitment required to be a Sergeant Major in the ALARNG would interfere with the job.

16

Clark Decl. (Doc. 32-1) ¶¶ 4-6; Clark Depo. (Doc. 29) Def. Ex. 4 at 93-93.  Accepting Clark's testimony concerning Jordan's alleged statements as true, it is prima facie evidence that his ALARNG membership was a motivating factor in his non-selection for Chief of Operations.  But this finding does not end the inquiry.

The City has proffered evidence that when Chief Jordan selected Bolling as Chief of Operations in February 2017, Bolling had served as an Assistant Chief since October 2008, a period of eight years and four months, and had managed many of MFD's divisions. Jordan Affidavit (Doc. 29-2) ¶ 5.  In contrast, Clark had been promoted to Assistant Chief in June 2016 and had only served in that position for eight months at the time of Bolling's appointment.  *Id.*  Bolling's far greater experience is a legitimate reason that, standing alone, would have caused the City to select Bolling over Clark regardless of Clark's ALARNG service.  *See*, 38 U.S.C. § 4311(c); *Coffman*, 411 F.3d at 1238-39.  Clark states only that "I was the most qualified candidate for the Chief of Operations position," and completely fails to adduce any evidence showing he was better qualified than Bolling. Clark Decl. (Doc. 32-1) ¶ 11.  A jury could not find that Clark was better qualified than Bolling on the basis of his unsupported conclusory statement, and the City's affirmative defense prevails.

The same is true for Gauntt's selection.  Chief Jordan appointed Gauntt as Chief of Operations in July 2018 when Bolling retired.  Jordan Affidavit (Doc. 29-2) ¶ 6.  Gauntt's selection coincides with Chief of Staff Petrey's July 6, 2018, memorandum documenting "a pattern of repeated and escalating inadequate performance in Special Operations Assistant Fire Chief T. Clark's job tasks."  Petrey Memo (Doc. 29-1) Def. Ex. 1 at 18;

(Doc. 32-7) at 1.  Chief Jordan testifies that Clark would not have been a viable candidate for Chief of Operations at the time of Gauntt's selection due to his inadequate work performance.  Jordan Affidavit (Doc. 29-2) ¶ 6.  As with Bolling, Clark has failed to adduce any evidence showing he was better qualified than Gauntt, particularly in light of Petrey's July memo.  Accordingly, there is no legitimate dispute of material fact on the City's affirmative defense.

### B. <u>USERRA Harassment</u>

Clark apparently intends to bring a USERRA harassment claim and argues that he "has created a material dispute of fact as to whether his military service was a motivating factor in the City's harassment[.]" Pl's Opp. (Doc. 33) at 19.  The Court's analysis of this claim is guided by the Eleventh Circuit's opinion in *Dees v. Hyundai*, 368 F. App'x 49, 53 (11th Cir. 2010) (unpublished).  *Dees,* like this case, involved an ALARNG soldier who alleged that he was terminated from his civilian job due to his military service.  *Id.* at 50. The Eleventh Circuit held that the soldier failed to establish that his military status was a motivating factor in his termination.  *Id.* at 51-52.  It then addressed his separate harassment claim.  *Id.* at 52-53.

The Circuit Court first explained that it has not decided whether harassment or hostile work environment is a cognizable claim under USERRA.  *Id.*  Assuming that it is, the Circuit Court then explained that a terminated employee has no standing to bring a separate harassment claim because relief under USERRA is limited to (1) an injunction requiring compliance, (2) compensation for lost wages or benefits, and (3) liquidated damages for lost wages or benefits if noncompliance was willful.  *Id.* at 52 (citing 38 U.S.C.

§ 4323(d)(1)(A)-(C)).  The Eleventh Circuit reasoned that an injunction would have no benefit to a former employee, and the alleged harassment did not involve lost wages or benefits.  *Id.* at 53.  Therefore, the alleged harassment was not redressable by a favorable court decision, and the terminated employee lacked constitutional standing.  *Id.*  Clark's harassment claim here is identical to the one rejected by the Eleventh Circuit in *Dees*, and it fails for the same lack of standing.

In addition, courts that have recognized a USERRA harassment cause of action require "evidence that the employer's conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."  *Miller v. City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002).  Some factors courts should consider are "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it interfered with the employee's work performance."  *Id.*  The court should examine the circumstances "from an objective perspective to determine whether a reasonable person would perceive the situation to be hostile."  *Id.*

Clark's evidence of harassment here falls far short of the mark.  The undisputed facts show that MFD promoted Clark to Lieutenant in 2005, Captain in 2008, District Chief in 2012, and Assistant Fire Chief in 2015.  Clark Depo. (Doc. 29) Def. Ex. 4 at 74-75.  Each of these promotions was made on the recommendation of Chief Jordan.  Jordan Affidavit (Doc. 29-2) ¶ 3.  Clark was serving in the ALARNG at the time of each of these promotions including a deployment to Afghanistan from June 2004 through September 2005 and extended military orders from July through September 2013.   Clark Depo. (Doc. 29) Def.

Ex. 4 at 84, 79-80.  Clark has presented absolutely no evidence that MFD ever denied him military leave to attend drill or annual training or in any way interfered with his ability to perform ALARNG duty at any time in his thirty-year civilian firefighting career.

Clark's primary evidence of harassment is his claim that beginning in 2016 and continuing through 2018 Chief Jordan often "made sly remarks" when passing such as "You're not drilling today?"  Clark Decl. (Doc. 32-1) ¶ 10.  Accepting this as true, it hardly constitutes the type of severe or pervasive conduct that alters the conditions of employment and creates an abusive work environment.  Clark also tries to tie Petrey's July 6, 2018, memo documenting his performance deficiencies (Doc. 32-7) and his allegedly coerced retirement in February 2019 to his ALARNG service, but there is no evidence that either action was in any way related to his military status.  Viewed from an objective perspective, Clark has not produced sufficient evidence to allow a jury to find in his favor on a USERRA harassment claim, particularly in light of MFD's favorable treatment of Clark throughout his ALARNG career.

### C.   USERRA Retaliation

Clark argues that he "has created a material dispute of fact as to whether his military service was a motivating factor in the City's retaliation and Clark's 'constructive discharge.'"  Pl's Opp. (Doc. 33) at 20.  USERRA's anti-retaliation provision provides that an employer may not take an adverse employment action against any person because they have (1) "taken an action to enforce a protection afforded any person under this chapter," (2) "testified or otherwise made a statement in or in connection with any proceeding under this chapter," (3) "assisted or otherwise participated in an investigation under this chapter,"

or (4) "exercised a right provided for in this chapter." 38 U.S.C. § 4311(b). An employer violates this anti-retaliation provision if the "person's enforcement action, testimony, statement, assistance, participation, or exercise of a right" under USERRA "is a motivating factor in the employer's action, unless the employer can prove that the action would have taken place in the absence of such person's protected activity." 38 U.S.C. § 4311(c)(2). This is the same burden-shifting framework employed in USERRA's anti-discrimination provision. *See,* 38 U.S.C. § 4311(a); (c)(1).

The City argues that Clark's retaliation claim fails because there is no evidence that Clark took any action to enforce USERRA or engaged in any other protected activity. Def's MSJ (Doc. 29) at 9-10. The Court agrees. As a threshold matter, § 4311(b)(1) requires "an action to enforce a protection afforded" by USERRA. 38 U.S.C. § 4311(b)(1). The Department of Labor (DOL), through its Veteran's Employment and Training Service (VETS), is charged with administrative enforcement of USERRA. 38 U.S.C. § 4303 (11) (defining "Secretary" as Secretary of Labor); §§ 4321-4323 (USERRA enforcement provisions). To initiate an administrative action, a person must file a written complaint with DOL. 38 U.S.C. § 4322(a); (b). DOL is required to investigate each USERRA complaint within 90 days, and if it determines that a violation occurred, "shall attempt to resolve the complaint by making reasonable efforts to ensure that the person or entity named in the complaint complies with the provisions of this chapter." 38 U.S.C. § 4322 (d). If DOL's efforts to resolve the complaint with the employer are unsuccessful, the complainant may request referral to the Department of Justice for judicial enforcement. 38 U.S.C. § 4323 (a). USERRA also creates a private right of action that may be pursued

21

whether or not an administrative complaint has been filed with DOL.  38 U.S.C. § 4323 (a)(3).

Here, the facts show that Clark never filed a complaint with DOL about MFD.  At most, he complained to his National Guard chain of command about difficulties he was experiencing with his civilian employer.  This is not a qualifying action to enforce a protection afforded by USERRA.  DOL's USERRA handbook explains under "Reprisals" that "[e]mployers are prohibited from retaliating against anyone (whether or not they have performed military service) who: files a complaint under the law; testifies assists or otherwise participates in an investigation or proceeding under the law; or exercises any right provided under the law."  VETS, *USERRA-A Guide to the Uniformed Services Employment and Reemployment Rights Act* at 25.[5]  The National Guard has no role in USERRA enforcement, and complaining to one's military chain of command is insufficient to trigger USERRA's anti-retaliation protections.

Moreover, the record evidence here undermines Clark's assertion that his complaints to the ALARNG were somehow a USERRA enforcement action.  The summary judgment record shows two phone calls to the City from ALARNG officers concerning Clark.  In the first, COL Presley called Chief Jordan.  Presley Decl. (Doc. 32-3).  The primary topic of this conversation was to determine whether MFD had investigated or notified police about alleged verbal threats by Clark to other firefighters because that could affect Clark's military security clearance.  *Id.* ¶¶ 5-7.  COL Presley then "brought up the

---

[5] https://www.dol.gov/agencies/vets/programs/userra/USERRA%20Pocket%20Guide accessed 8/6/20.

issues concerning Mr. Clark attending drills with the Alabama National Guard" and Chief Jordan "offered no response[.]"  This is hardly a USERRA enforcement action.  Next, LTC Norman called Director of Public Safety Sams and told him he had concerns about "the way Montgomery was adversely treating Mr. Clark because of his participation in the Alabama National Guard" and that "this was a very serious matter."  Norman Decl. (Doc. 32-8) ¶ 8.  Sams told LTC Clark that he would look into it and call him back but never did. *Id.* ¶ 9.  There is no evidence that Sams ever communicated with Chief Jordan or anyone in MFD about LTC Norman's call.  Again, this is not a qualifying USERRA enforcement action that triggers the statute's anti-retaliation provision.

With respect to exercising rights provided for in USERRA, 38 U.S.C. § 4311(b)(4), the evidence shows that Clark deployed to Afghanistan from June 2004 through September 2005, and upon his return MFD promptly reemployed him and then promoted him to Lieutenant.  Clark Depo. (Doc. 29) Def. Ex. 4 at 74-75.  He also went on military orders from July through September 2015, and MFD promptly reemployed him and subsequently promoted him to Assistant Fire Chief.  *Id.* at 79-80.  Other than these two instances, the record evidence shows that Clark's ALARNG duty was limited to weekend drills and annual training, and MFD never denied him military leave to attend this duty.

There is absolutely no record evidence showing that Clark's allegedly coerced retirement in February 2019 had anything to do with his membership in the ALARNG. "USERRA affords certain protections to service members, but it does not exempt those in the military from complying with the usual rules of behavior in the workplace or being subject to the usual discipline."  *Corbin v. Southwest Airlines, Inc.*, 107 Fed. R. Evid. Serv.

740, 2018 WL 4901155, at *15 (S.D. Tex. 2018) (internal quotes and citation omitted). The undisputed evidence here shows that Clark was given the option to retire or face disciplinary action when he refused to return to work in January 2019 after he exhausted his FMLA leave and extended leave.  This had nothing to do with his military service.

<strong>D.</strong>   <strong><u>Procedural Due Process</u></strong>

To state a due process claim, a plaintiff must show that he had a constitutionally-protected liberty or property interest, state action, and constitutionally-inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  The Eleventh Circuit explains that "[p]rocedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest." *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir. 1995) (*citing Donaldson v. Clark*, 819 F.2d 1551, 1558 (11th Cir. 1987) (en banc)).  "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  *See also Reeves v. Thigpen*, 879 F. Supp. 1153, 1171 (M.D. Ala. 1995) (holding same).  Here, the undisputed evidence shows that Clark chose to retire in order to avoid the very pre-termination process he now claims the City denied him.  Clark cannot have it both ways.

The City's governing personnel rules and regulations, which have the force and effect of law, provide that "[a]ny permanent employee may be dismissed by an appointing authority for cause."  City and County of Montgomery Rules and Regulations (Revised March 1988 and including all Amendments through April 1, 2020) (Doc. 32-2) Rule X, §

4 at p. 61.  Rule IX, § 2, entitled Pre-Determination Hearing, provides that "a permanent employee is entitled to a hearing before the appointing authority . . . prior to his . . . dismissal . . . as to any charges which might cause the employee to be dismissed[.]" *Id.* at 58.  This Rule continues that "[n]o merit system employee can be . . . dismissed . . . 'for cause' by any appointing authority unless and until such employee has been given written notice, setting forth with particularity the charges against him/her and the opportunity to be heard prior to . . . dismissal[.]" *Id.*  This rule complies with the procedural requirements of the Due Process Clause.  The City's attorney sent Clark's attorney an email containing a link to the City's personnel rules on January 7, 2019, so Clark was aware of this rule.

In her email of January 8, 2019, the City's attorney advised Clark's attorney that "[a]t this juncture, Mr. Clark's options are to apply for retirement or face disciplinary action.  To that end, if he has not made application with the City of Montgomery Retirement system by close of business tomorrow, the City will begin the *process of initiating disciplinary action* for his failure to return to work on Jan 2."  Reed email dated January 8, 2019 at 2:07 p.m. (Doc. 29-3) Def. Ex. 3 at 2-3 (emphasis added).  In other words, Clark could retire, or the City would start the process of terminating him for cause that included the notice and opportunity to be heard mandated by Rule IX, § 2.

This position is confirmed by the City attorney's next email stating: "I'm writing to follow up on our conversation of yesterday afternoon and provide answers to the three questions you posed: (1) Can Mr. Clark have until Friday to make a decision? (2)  Does he still have the option to return to work? [and] (3) If he elects to retire, will he do so in good standing?"  Reed email dated January 9, 2019 at 9:12 a.m. (Doc. 29-3) Def. Ex. 3 at 1-2.

25

In response to these questions, the City's attorney stated that "I discussed the above with the fire department, and they advise that if Mr. Clark returned to work, he would still be facing disciplinary action for failing to return to work on January 2. So, returning to work is no longer an option." *Id.* at 2. She cautioned that "[i]f they have not received his resignation by close of business Friday, they will have no choice but to proceed with the above-referenced disciplinary action." *Id.* Again, Clark could retire, or the City would initiate the process to terminate him for cause. That process included a Pre-Determination Hearing under Rule IX, § 2. Clark chose to retire.

The Eleventh Circuit instructs that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause[.]" *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). Resignations "where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff *had a choice*" to "stand pat and fight." *Id.* (emphasis original)(internal quotes and citation omitted). The only exception to this rule "is where the employer actually lacked good cause to believe that grounds for the [threatened] termination" action existed. *Id.*

Here, the undisputed evidence shows that MFD had good cause to believe that Clark committed a terminable offense when he refused to report to work as ordered on January 2, 3, or 4 when his extended leave expired. *See, e.g.,* Jordan Affidavit (Doc. 29-2) ¶ 7. If Clark believed that this was not adequate grounds for termination, he could have elected to stand pat and fight, face the termination process, and raise his defenses at the Pre-Determination Hearing under the City's Rule IX, § 2. Instead, he decided to retire. Clark

was represented by counsel when he made his decision to retire, and his communications with the City concerning his options were all made through his lawyer.  Clark's retirement was voluntary under these circumstances, and the City did not violate his due process rights.  The Alabama Supreme Court "has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution," so no separate analysis of Clark's State constitutional claim is required.  *Ex parte DBI, Inc.*, 23 So. 3d 635, 643 (Ala. 2009) (internal quotes and citation omitted).

## VI.    <u>CONCLUSION</u>

For the above-stated reasons, the City's motion for summary judgment (Doc. 29) is GRANTED and Clark's claims are DISMISSED in their entirety WITH PREJUDICE.  A separate judgment shall issue.

Done this 4th day of September, 2020.

/s/ Stephen M. Doyle
CHIEF UNITED STATES MAGISTRATE JUDGE